562 S.E.2d 147

**In re DANIEL D. and Samantha D.**

No. 29965.

Supreme Court of Appeals of ·
West Virginia.

Submitted Jan. 9, 2002.

Decided Feb. 22, 2002.

Dissenting Opinion of Chief Justice
Davis March 15, 2002.

Dana R. Shay, Fairmont, West Virginia, for Daniel D., Father.

Rebecca L. Tate, Fairmont, West Virginia, Guardian Ad Litem.

Darrell V. McGraw, Jr., Attorney General, Charleston, West Virginia, Rocco S. Fuccillo, Assistant Attorney General, Fairmont, West Virginia, for WV Department of Health & Human Resources.

ALBRIGHT, J.

This is an appeal by Daniel D.[1] (hereinafter "Appellant") from an order of the Circuit Court of Marion County terminating his parental rights to two children, Daniel D., Jr., and Samantha D. The Appellant contends that the lower court erred in terminating his parental rights and by violating his due process rights. Having thoroughly reviewed the briefs, record, and arguments of counsel, we reverse the termination of the Appellant's

---

**1.** Consistent with our practice in cases involving sensitive facts, we identify the parties by initial only. *See In re Jeffrey R.L.,* 190 W.Va. 24, 26 n. 1, 435 S.E.2d 162, 164 n. 1 (1993).

parental rights and remand with directions to permit the Appellant to participate in one additional improvement period designed to facilitate therapeutic evaluation and treatment, if desired by the Appellant, and to consider what post-termination visitation, if any, is appropriate in the event that termination of parental rights is imposed.

## I. Facts and Procedural History

On October 24, 1999, the maternal grandmother of Daniel D., then age two, and Samantha D., then age four, contacted the West Virginia Child Abuse Hotline, reporting that Samantha D. had informed her that the Appellant, Samantha's father, had put his penis in her mouth several times. The allegations were investigated by the West Virginia Department of Health and Human Resources (hereinafter "DHHR")[2] and a petition for abuse and neglect was filed on December 30, 1999.[3]

A preliminary hearing was conducted before the lower court on January 18, 2000. Samantha testified regarding the abuse, explaining the details of the sexual actions and reciting explicit descriptions of her father's actions. Psychologist Terry Laurita testified that she had evaluated Samantha and had confirmed that she had been sexually abused by her father. Ms. Laurita also testified concerning the inappropriate sexual knowledge Samantha possessed for her age. On February 23, 2000, the lower court conducted an adjudicatory hearing at which the Appellant continued to exercise his right to remain silent. Ms. Laurita opined that the Appellant would be incapable of providing the children with the support they needed if no admission of the abuse was made. She further opined that any contact between the Appellant and Samantha would send an unhealthy message to the child. At the conclusion of the adjudicatory hearing, the lower

court found that the Appellant had sexually abused Samantha, denied visitation to the Appellant, granted him a three-month improvement period, and suggested a psychological evaluation and assessment of his parenting skills.

During the improvement period, the Appellant underwent psychological evaluations by licensed psychologist Ronald D. Pearse. The Appellant denied the allegations of sexual abuse during these evaluations. Subsequent to the April 2000 testing,[4] the evaluator recommended that the Appellant have no unsupervised visitation with the children and concluded as follows:

> Mr. [D.] continues to deny the sexual abuse charges. However, records indicate an evaluation was completed of his daughter indicating a fairly clear-cut case of sexual abuse. Keeping the safety of his children in mind, it is not recommended that Mr. [D.] have any unsupervised visits. He is not a good candidate for treatment at this time due to his inability to admit to any sexual molestation that occurred.

On May 31, 2000, the lower court granted the Appellant a ninety-day extension of his improvement period and denied his request for visitation. On June 13, 2000, the Appellant was indicted for first degree sexual assault; sexual abuse by a parent, guardian, or custodian; and incest. Due to the pending criminal charges, the Appellant continued to exercise his right to remain silent during further meetings associated with the abuse and neglect proceedings. On August 28, 2000, the lower court denied the Appellant's request for an additional ninety-day improvement period and denied his request for visitation with the children.

The lower court conducted a dispositional hearing on November 28, 2000, at which Ms.

---

2. Rebekah Bledsoe, a representative of the DHHR, and Doris James, a Marion County Sheriff's Department Detective, investigated the report and concluded that there was sufficient evidence to substantiate the report of sexual abuse and justify the filing of an abuse and neglect petition against the Appellant.

3. The petition also alleged alcohol and substance abuse by the Appellant.

4. Some of the tests were deemed invalid due to a finding that the Appellant "was attempting to present himself in a favorable light" and "was not being open and honest during the evaluation." The testing also revealed that the Appellant's "defensiveness scores were significantly elevated. This indicates that he may have been attempting to minimize his problem. His answers indicated that he likely has emotional problems and/or a behavioral disorder."

Laurita testified that Samantha had consistently identified the Appellant as her abuser. Ms. Laurita further testified that it was essential that the Appellant participate in therapy and that in order to obtain treatment as a sexual offender, it was imperative that the Appellant admit to the abuse and request treatment. Despite the fact that the court had provided the Appellant with improvement periods, he had not admitted the abuse and had not begun treatment or counseling. Ms. Melissa Pickens of DHHR testified that despite the offer of reasonable services to the Appellant, he had not availed himself of such services and had made no attempt to seek treatment. Ms. Pickens explained that due to the Appellant's denial that abuse had occurred, the DHHR did not know of any services which could be provided to assist the Appellant or reunify the family. Ms. Pickens further opined that the Appellant had not utilized his improvement periods and that reunification was not in the best interests of the children.

The lower court terminated the Appellant's parental rights to Samantha and Daniel by orders dated February 5, 2001. The lower court order reiterated the prior evidence, testimony, and evaluations and concluded that there was no reasonable likelihood that the conditions of abuse could be substantially corrected in the near future. The court noted that "[c]ourts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened...."[5] The court further recognized that it was compelled to review the degree to which the Appellant had attempted to attain goals in the improvement period and whether sufficient improvement had been made. The

court explained that "[i]n the difficult balance which must be fashioned between the rights of the parent and the welfare of the child," the child's rights prevail.

The Appellant appeals the determination of the lower court, maintaining that his due process rights were violated by the lower court's reliance upon his denial of the abuse and unwillingness to undergo treatment as a basis for the termination of parental rights.

## II. Standard of Review

This case raises issues of constitutional rights and statutory interpretation. This Court indicated in *Phillip Leon M. v. Greenbrier County Board of Education*, 199 W.Va. 400, 484 S.E.2d 909 (1996), that "[b]ecause interpretations of the West Virginia Constitution, along with interpretations of statutes and rules, are primarily questions of law, we apply a *de novo* review." *Id.* at 404, 484 S.E.2d at 913. In syllabus point one of *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995), we also explained: "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."

## III. The Hobson's Choice[6]

The Appellant raises an issue concerning the classic dilemma confronted by the individual encountering charges in both civil and criminal contexts. He exercised his Fifth Amendment right to silence in the underlying abuse and neglect proceedings in order to protect himself from incrimination in the pending criminal case. Based in substantial part upon his silence and the absence of treatment potential for an individual main-

---

**5.** The lower court cited *In re Lacey P.*, 189 W.Va. 580, 433 S.E.2d 518 (1993), for this proposition. Syllabus point one of *Lacey* provides:

" '[C]ourts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by nu-

merous placements.' *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980)." Syllabus point 1, *Interest of Darla B.*, 175 W.Va. 137, 331 S.E.2d 868 (1985).

**6.** The standard Hobson's Choice refers to a choice without an alternative. Reference to a "Hobson's Choice" is said to have originated with a Thomas Hobson, a livery stable owner in Cambridge, England, who purportedly required every customer to take either the horse closest to the door or none at all.

taining silence, the Appellant's parental rights were terminated.

This scenario has been recurrently addressed, and definitive themes have emerged in the methods by which courts have resolved the Fifth Amendment allegations of individuals facing parallel issues in civil and criminal contexts. The Minnesota Court of Appeals addressed this dilemma in *In re S.A.V.*, 392 N.W.2d 260 (Minn.Ct.App.1986), wherein a trial court had ordered the allegedly abusive parents to attend parenting classes and psychological counseling. The father contended on appeal that the order requiring his admission in psychological evaluation violated his privilege against self-incrimination. The Minnesota court rejected his argument based upon the fact that the termination of parental rights was not a sanction for refusal to testify and that the termination was "simply the necessary result of failure to rectify parental deficiencies." *Id.* at 264.

The Minnesota Supreme Court addressed a similar issue in *In re J.W.*, 415 N.W.2d 879 (Minn.1987), in which the trial court had ordered psychological therapy to include an explanation of the death of the child in question. The prosecutor had indicated that refusal to cooperate would result in the filing of a termination petition. On appeal, the Minnesota court found that while the trial court could not directly require the parents to incriminate themselves in therapy, the state could require therapy generally. If the therapy was thereafter deemed to be ineffective, termination could proceed. "These consequences lie outside the protective ambit of the Fifth Amendment." *Id.* at 883. The court explained:

> What the parents would like to claim, although of course they cannot, is that their responsibility for the death of a child and the inferences arising therefrom is privileged and may not be considered in determining their suitability as parents. But to state this proposition is to refute it. Not only does the proposition ignore the fact that the evidence of responsibility has already been received but it ignores the best interests of the children.

*Id.* at 884. The court reasoned: "In the lexicon of the Fifth Amendment, the risk of

losing the children for failure to undergo meaningful therapy is neither a 'threat' nor a 'penalty' imposed by the state. It is simply a consequence of the reality that it is unsafe for children to be with parents who are abusive and violent." *Id; see also In re J.G.W.*, 433 N.W.2d 885 (Minn.1989).

Similarly, in *New Jersey Division of Youth and Family Services v. S.S.*, 275 N.J.Super. 173, 645 A.2d 1213 (1994), the reviewing court held that requiring a mother to rebut prima facie evidence of abuse did not violate her Fifth Amendment privilege against self-incrimination. The New Jersey court relied upon *In re S.*, 66 Misc.2d 683, 322 N.Y.S.2d 170 (Fam.Ct.1971), in which the following reasoning was utilized:

> There is no mandatory requirement that they take the stand and testify. That would be unconstitutional. The constraint upon respondent to give testimony arises here simply from the force of circumstances and not from any form of compulsion forbidden by the Constitution. . . .
>
> It may be a difficult decision for the respondents and their attorneys. [But] it is a question of procedure and legal options for the defense, not one of the constitutionality of incrimination. . . .

*Id.* at 1217, 322 N.Y.S.2d 170 (*quoting In re S.*, 322 N.Y.S.2d at 177–78).

The Nebraska court grappled with this issue of refusal to speak in an abuse and neglect proceeding based upon fear of incrimination in *In re Clifford M.*, 6 Neb.App. 754, 577 N.W.2d 547 (Neb.1998). The Nebraska court held, in this issue of first impression for that court, that parental rights could not be terminated based solely upon the refusal to waive the right against self-incrimination. In so holding, the court noted that a review of other states' authority indicated:

> that there is a very fine, although very important, distinction between terminating parental rights based specifically upon a refusal to waive protections against self-incrimination and terminating parental rights based upon a parent's failure to comply with an order to obtain meaningful therapy or rehabilitation, perhaps in part

because a parent's failure to acknowledge past wrongdoing inhibits meaningful therapy. The latter is constitutionally permissible; the former is not.

*Id.* at 554.

In examining possible accommodations for this testimonial dilemma, scholars have opined that the potential for continuing the abuse and neglect action until after the conclusion of the criminal case is not palatable for the obvious reason that prompt disposition of child abuse/neglect proceedings is essential.[7] *See generally* Jessica Wilen Berg, Note, *Give Me Liberty or Give Me Silence: Taking a Stand on Fifth Amendment Implications for Court–Ordered Therapy Programs,* 79 Cornell L.Rev. 700 (1994); William Wesley Patton, *The World Where Parallel Lines Converge: The Privilege Against Self–Incrimination in Concurrent Civil and Criminal Child Abuse Proceedings,* 24 Ga. L.Rev. 473 (1990). This jurisdiction has definitively spoken to that issue, as manifested in Rule 5 of the Rules of Procedure for Child Abuse and Neglect, wherein it is provided that "[u]nder no circumstances shall a civil protection proceeding be delayed pending the initiation, investigation, prosecution, or resolution of any other proceeding, including, but not limited to, criminal proceedings."

Commentators have observed that providing use immunity is the most practical and efficient method of protecting the privilege against self-incrimination while simultaneously advancing the best interests of the child by granting an inducement for full cooperation and disclosure during the child abuse and neglect proceedings. Patton, *The World Where Parallel Lines Converge: The Privilege Against Self–Incrimination in Concurrent Civil and Criminal Child Abuse Proceedings,* 24 Ga.L.Rev. at 521–22.[8]

In *In re Jessica B.,* 207 Cal.App.3d 504, 254 Cal.Rptr. 883 (1989), a case in which the trial court had refused family reunification because the father had not acknowledged his wrongdoing, the appellate court found that use immunity would preserve the father's privilege against self-incrimination. The California court held as follows:

The California Constitution requires that a person proceeding simultaneously in the criminal courts for child abuse and the juvenile court regarding a dependency of the abused minor should not only be granted use immunity for his or her testimony at dependency proceedings that constitutes an admission to the acts at issue in the criminal case against him or her but also for such statements made during court-ordered therapy. Under the circumstances of this case, such an immunity is essential to the constitutional privilege against self-incrimination and facilitates the goal of protecting the best interest of the minor and achieving the reunification of the family at the earliest possible date.

*Id.* at 893–94.

Similarly, in *In re Eduardo A.,* 209 Cal. App.3d 1038, 261 Cal.Rptr. 68 (1989), procedural protections were afforded to individuals caught in this labyrinth. In that case, the California court addressed the patient-psychotherapist privilege and found that the

---

7. In *Wehling v. Columbia Broadcasting System,* 608 F.2d 1084 (5th Cir.1979), however, the Fifth Circuit found that a continuance of the civil case until after the accused's criminal responsibility was determined would be an appropriate resolution. *Id.* at 1089.

8. A question has also been raised regarding whether a parent can be impeached during the criminal action with statements made during the abuse and neglect action. "[T]o the extent that use immunity is granted for statements made in court-ordered therapy in order to facilitate family reunification, the precedents indicate that such statements could not later be used to impeach the parents." 24 Ga.L.Rev. at 522; *see also New Jersey v. Portash,* 440 U.S. 450, 459, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979) (holding that testimony given under use immunity is "the essence of coerced testimony" and cannot be used for impeachment purposes). In 1972, the United States Supreme Court decided *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), concluding that immunity against use and derivative use of incriminatory testimony was sufficient to protect the Fifth Amendment privilege. *Id.* at 453, 92 S.Ct. 1653. The Supreme Court also explained that the granted protection is not dependent upon the good faith of a prosecutor because, subsequent to witness disclosure that he or she testified under a grant of immunity, the prosecution has the burden to show that the evidence being used came from legitimate sources, "wholly independent of the compelled testimony." *Id.* at 460, 92 S.Ct. 1653.

legislature had intended to abrogate the privilege only in the context of examinations ordered by the court as an initial investigative tool, but did not intend to abrogate the privilege in the context of psychotherapeutic treatment. *Id.* at 71. "It would be unreasonable to expect a patient to freely participate in such treatment if he knew that what he said and what the therapist learned from what he said could all be revealed in court." *Id.* at 70.

Protective or limiting orders may also be utilized in conjunction with the grant of use immunity. In *State v. Decker*, 68 Wash.App. 246, 842 P.2d 500 (1992), for instance, the court addressed the a tribunal's inherent authority to issue protective orders and affirmed the use of a protective order entered regarding a predisposition psychological evaluation. *Id.* at 503.

### IV.  West Virginia's Statutory Guidance

#### A.  Language of the Statutes

In attempting to reconcile the competing interests involved in the case sub judice, we are assisted, to some extent, by the substance of West Virginia Code § 49–6–4(a) (1984) (Repl.Vol.2001), West Virginia Code § 57–2–3 (1965) (Repl.Vol.1997), and West Virginia Code § 49–7–1 (2000) (Repl.Vol. 2001). While the Appellant acknowledges the existence of certain protections contained in these statutes, he contends that such protections are inadequate · to permit the full exercise of his Fifth Amendment right against self-incrimination and the vigorous defense of his parental rights.

West Virginia Code § 49–6–4(a) addresses medical and mental examinations in the child abuse and neglect proceeding and provides as follows:

(a) At any time during proceedings under this article the court may, upon its own motion or upon motion of the child or other parties, order the child or other parties to be examined by a **physician, psychologist or psychiatrist,** and may require testimo-

ny from such expert, subject to cross-examination and the rules of evidence: Provided, That the court shall not terminate parental or custodial rights of a party solely because the party refuses to submit to the examination, nor shall the court hold such party in contempt for refusing to submit to an examination. The physician, psychologist or psychiatrist shall be allowed to testify as to the conclusions reached from hospital, medical, psychological or laboratory records provided the same are produced at the hearing. The court by order shall provide for the payment of all such expert witnesses. If the child, parent or custodian is indigent, such witnesses shall be compensated out of the treasury of the State, upon certificate of the court wherein the case is pending. **No evidence acquired as a result of any such examination of the parent or any other person having custody of the child may be used against such person in any subsequent criminal proceedings against such person.**

W.Va.Code § 49–6–4(a) (emphasis supplied). West Virginia Code § 57–2–3 provides additional protection, as follows: "In a criminal prosecution other than for perjury or false swearing, evidence shall not be given against the accused of any statement made by him as a witness upon a legal examination." Finally, West Virginia Code § 49–7–1 provides generally for confidentiality of records concerning a child which may be accumulated by DHHR.[9]

#### B.  This Court's Prior Consideration of Pertinent Statutes

This Court addressed the statutory protections in *West Virginia Department of Health and Human Resources ex rel. Wright v. Doris S.,* 197 W.Va. 489, 475 S.E.2d 865 (1996), as they affect the issue of utilization of evidence in the civil and criminal contexts against the interests of a parent also accused of a crime related to the alleged abuse and neglect of children.  This Court explained:

**9.** Section 49–7–1 provides in that records "concerning a child or juvenile which are maintained by the division of juvenile services, the department of health and human resources, a child agency or facility, court or law-enforcement agency shall be kept confidential and shall not be released or disclosed to anyone, including any federal or state agency." The statute contains numerous exceptions.

Such a parent or guardian may be invoking his/her right to remain silent pursuant to the Fifth Amendment because that individual also may be facing criminal charges arising out of the abuse and neglect of the child. The rights of the criminally accused are sufficiently protected, however, by the following statutory provisions: 1) West Virginia Code § 49–6–4(a) (1995) which allows medical and mental examinations of the child or other parties involved in an abuse and neglect proceeding provides that "[n]o evidence acquired as a result of any such examination of the parent or any other person having custody of the child may be used against such person in any subsequent criminal proceedings against such person;" 2) West Virginia Code § 49–7–1 (1995) provides that "[a]ll records of the state department, the court and · its officials, law-enforcement agencies and other agencies or facilities concerning a child as defined in this chapter shall be kept confidential and shall not be released ...[;]" and 3) West Virginia Code § 57–2–3 (1966) provides that "[i]n a criminal prosecution other than for perjury or false swearing, evidence shall not be given against the accused of any statement made by him as a witness upon a legal examination." *Id.* at 497–98, n. 22, 475 S.E.2d at 873–74, n. 22.

In *Wright,* a case involving the death of child, this Court reviewed the authorities supporting "the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Id.* at 498, 475 S.E.2d at 874, *quoting Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976).[10] In light of that

review of authorities, this Court held as follows in syllabus point two of *Wright:*

Because the purpose of an abuse and neglect proceeding is remedial, where the parent or guardian fails to respond to probative evidence offered against him/her during the course of an abuse and neglect proceeding, a lower court may properly consider that individual's silence as affirmative evidence of that individual's culpability.

*Id.* at 492, 475 S.E.2d at 868.

### C. Application of the Statutes to the Appellant's Case

We are satisfied that this rule allowing a trial court to consider one's silence as affirmative evidence of culpability, as set forth in *Wright,* is soundly supported by the authorities and is consistent with the policy of this State which encourages prompt hearing of abuse and neglect cases and a paramount concern for the best interests of the children involved in such proceedings. We · are also satisfied that the rule does not offend the protections against self-incrimination afforded by the Fifth and Fourteenth Amendments to the Constitution of the United States and Article III, Section 5 of our State Constitution. As applied to the issue of culpability, the rule simply confronts the accused parent with a choice: Assert the privilege against self-incrimination with the risk that silence will be considered in the civil proceeding as evidence of culpability, or waive the privilege and offer such evidence as the accused may alone possess to refute the charge of abuse and neglect.

The Appellant argues, however, that this Court was in error when it concluded in *Wright* that the statutory protections cited in *Wright* are sufficient to permit Appellant's

---

10. This Court explained as follows in *Wright:*
   There is no basis in law for requiring that a court be disallowed from considering a parent's or guardian's choice to remain silent as evidence of civil culpability. Moreover, the invocation of silence by a parent or guardian in an abuse and neglect proceeding goes to the heart of the treatability question which is essential in these cases, as the nature of the proceedings is remedial and not punitive. Thus, in order to remedy the abuse and/or

neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.
197 W.Va. at 497–98, 475 S.E.2d at 873–74 (footnotes omitted).

full and proper exercise of the right against self incrimination guaranteed to him by the Fifth and Fourteenth Amendments to the Constitution of the United States and by Article III, Section 5 of our State Constitution. The Appellant contends that the statutes relied upon in *Wright* do not protect him in all of the circumstances which might arise if he undertook a vigorous effort to maintain his parental rights and prevent their termination in the abuse and neglect proceedings. The Appellant maintains that participation in interviews with DHHR workers, participation in multi-disciplinary team meetings and submission to treatment, as contrasted with mere diagnostic examinations, by medical or other professional personnel are not within the scope of the protections afforded by the statutes relied upon in *Wright*. The Appellant further argues that none of the statutes protects him against the use of evidence gathered in the abuse and neglect proceedings to impeach any testimony offered against him in a subsequent criminal proceeding involving his alleged abuse and neglect of the children.

■ To address the Appellant's claims, we will discuss each relevant statute. West Virginia Code § 49-7-1, as quoted in pertinent part above, is a statute providing generally for the confidentiality of records of the Department of Health and Human Resources accumulated in abuse and neglect cases. The statute is replete with exceptions, including exceptions directing release of the information to "law-enforcement agencies and prosecuting attorneys, ... [a] grand jury, circuit court or family law master...." We find that West Virginia Code § 49-7-1 provides no meaningful protection of confidentiality or privilege for statements made by an accused in an abuse and neglect proceeding and is, in fact, designed to facilitate the dissemination of information to those charged with the public duty of prosecuting those who may be or are accused of criminal conduct.

The remaining statutes at issue appear to provide some substantive protection to those involved in abuse and neglect cases who may also be charged with crime related to the alleged abuse and neglect. The Appellee argues that these protective statutes provide adequate opportunity for a parent accused of abuse and neglect and also accused of a crime arising from any such alleged abuse and neglect to exercise rights against self-incrimination in the criminal proceeding. The Appellee further argues that the protections adequately balance the paramount interest of the State in the protection of children with the right of the Appellant against self-incrimination. The Appellee contends that those protective statutes therefore do not unconstitutionally deprive the Appellant of those rights. Finally, the Appellee argues that if the lower court is reversed "[t]he entire system for resolving abuse cases would be destroyed."

We do not shrink from a close examination of the Appellant's claims because of this warning of dire results. We share the view of the lower court that the issues raised by the Appellant present a very difficult situation. The trial court addressed the complexity of this issue on at least three separate occasions, as evidenced by the record of the proceedings below. During the February 23, 2000, adjudicatory hearing, the lower court astutely observed as follows:

I think we—in cases of this nature and specifically in this case, we put the father between the proverbial rock and a hard place in the sense that we tell him to go for clinical diagnosis, but he knows going in that anything he says which may incriminate him may be used against him at a later time.

And so if he does—faces the prospect of criminal charges, if he does exercise his right not to make a statement, which—which is a constitutional right, then that can be used against him to say, "Well, no improvement period. We're going to terminate your custodial rights." I think in this case inasmuch as the child has never been removed from her mother and is being placed with her mother and will remain there. That there's—there's no harm to be done by granting the father an improvement period just for the simple—I don't think this Court or any Court has any way of getting him out of the situation he's in now, and that is choosing between

losing his child or making admissions which my subject him to criminal penalties.... I'm hesitant about totally terminating his parental rights because counsel properly advised him that if the—these matters could be used against him, and he exercised his Fifth Amendment Rights.

During a May 31, 2000, hearing at the termination of one of the improvement periods, this issue was again raised, and the lower court stated:

I think he's in that place that we refer to between a rock and a hard place, and that is if he—the only way he can see the children is to admit it—admit the sexual abuse. And if he admits the sexual abuse, he's looking at criminal charges—an admission in criminal charges.

During the November 28, 2000, dispositional hearing, the lower court explained:

The Court is—again recognizes the situation the father's in. He's not been tried yet and obviously would not be to his best interest in the criminal proceeding to—to admit the acting in this proceeding.

If the protective statutes are narrowly read and applied, it appears to this Court that they do, in fact, provide little comfort to an accused abuser who desires (1) not to waive his right against self-incrimination, and (2) make a bona fide effort to fully participate in the process established for resolving abuse and neglect cases, including remedial examination and treatment. While the Appellee asserts in its brief that "it can be argued that" the protections of West Virginia Code § 57–2–3 could apply to Multi–Disciplinary Team proceedings, the Appellee did not so concede, and the Appellant, at the

lower court level, had every reason to fear that the Appellee would not so concede in his upcoming criminal prosecution.[11]

We recognize that if the statutes are construed to provide protections only for statements made in diagnostic examinations by a physician, psychiatrist or psychologist and to legal examinations had under oath, then the protections they offer may be seen as illusory. We likewise recognize that those statutes cannot, under any circumstances, operate to protect a criminal defendant's statements in an abuse and neglect proceeding from subsequent use in a criminal proceeding in any and all circumstances. Nevertheless, the statutes appear to provide substantial protections in this regard if carefully observed and liberally construed to achieve the remedial purposes for which it appears they were enacted.

### D. Liberal Construction

With specific reference to West Virginia Code § 49–6–4(a), that statute provides that no evidence acquired as a result a parent or other person having custody of a child being *examined by a physician, psychologist or psychiatrist* under court order may be used against such person in any subsequent criminal proceedings against such person and that the court shall not terminate parental or custodial rights of a party solely because the party refuses to submit to the examination. That statute is supplemented by West Virginia Code § 57–2–3, preventing the use of evidence acquired upon a "legal examination," in subsequent court proceedings other than a prosecution for perjury or false swearing.

11. Similarly, the Appellant fears that statements made in the abuse and neglect process may be used to impeach his testimony in a subsequent criminal proceeding; the Appellee proves that fear legitimate by arguing to this Court that *State v. Williams*, 171 W.Va. 556, 301 S.E.2d 187 (1983), requires the admission of prior statements proffered to impeach Appellant's testimony. However, we do not perceive that the possibility of using Appellant's prior statements in an abuse and neglect proceeding to impeach his testimony in a later criminal trial unduly interferes with a bona fide effort by one so accused to participate vigorously in an abuse and neglect proceeding. It may be presumed that one electing to testify in one's criminal trial intends to

testify truthfully, thereby minimizing the need to use prior statements to impeach that testimony. Secondly, we do not read *Williams* as overruling *State v. Price*, 113 W.Va. 326, 167 S.E. 862 (1933). In *Price*, this Court expressly disapproved the use of evidence given in a preliminary hearing to impeach testimony given in the ultimate trial of the case. *Id.* at 330, 167 S.E. at 864. Finally, we perceive that, in light of the express provisions of West Virginia Code § 49–6–4(a) and West Virginia Code § 57–2–3, a criminal defendant electing to exercise the privilege against self-incrimination in the criminal trial may be adequately protected from having *necessary prior statements* in the abuse and neglect proceeding utilized in the criminal trial.

In the case sub judice, in a slight variation on this proposition, the lower court took evidence from a psychologist to the effect that there was no hope of correcting the conditions of abuse because the Appellant, in the exercise of his privilege against self-incrimination, failed to admit the abuse during a psychological examination and argued that the statutes did not adequately protect him. We believe that the Appellant's argument has merit if the statutes are narrowly construed, but that the remedial purposes of the statutes require a broader construction.

Our abuse and neglect statutes contemplate reasonable and timely efforts being made during the course of the abuse and neglect proceedings to achieve a correction of the conditions creating the abuse or neglect. Moreover, there is little doubt that the Appellant's silence regarding the conditions of abuse—in essence, his failure to take part in the examination ordered by the lower court at least to the extent of discussing those conditions with the examining psychologist—contributed materially to the trial court's decision here to terminate parental rights.

As we contrast the design of our abuse and neglect statutes to provide reasonable and timely efforts to correct conditions creating abuse and neglect with the dilemma created by the Appellant's silence, we are guided by the holding of this Court in syllabus point one of *State v. White*, 188 W.Va. 534, 425 S.E.2d 210 (1992):

> " ' "A statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it is intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith." Syllabus

Point 5, *State v. Snyder*, 64 W.Va. 659, 63 S.E. 385 (1908).' Syl. Pt. 1, *State ex rel. Simpkins v. Harvey*, [172] W.Va. [312], 305 S.E.2d 268 (1983)." Syl. Pt. 3, *Shell v. Bechtold*, 175 W.Va. 792, 338 S.E.2d 393 (1985).

In syllabus point two of *White*, this Court continued:

> " 'In ascertaining legislative intent, effect must be given to each part of the statute and to the statute as a whole so as to accomplish the general purpose of the legislation.' Syl. Pt. 2, *Smith v. State Workmen's Compensation Commissioner*, 159 W.Va. 108, 219 S.E.2d 361 (1975)." Syl. Pt. 3, *State ex rel. Fetters v. Hott*, 173 W.Va. 502, 318 S.E.2d 446 (1984).

In discussing the protections afforded to the accused individual in *State v. James R., II*, 188 W.Va. 44, 422 S.E.2d 521 (1992), this Court referenced West Virginia Code § 49-6-4 and explained as follows in syllabus point three: "No evidence that is acquired from a parent or any other person having custody of a child, as a result of medical or mental examinations performed in the course of civil abuse and neglect proceedings, may be used in any subsequent criminal proceedings against such person. W.Va.Code § 49-6-4(a) (1992)."

Our review of the statutes, corresponding case law of this state, and authority from other jurisdictions compels our conclusion that West Virginia Code § 49-6-4 was intended to constitute a full and comprehensive prohibition against criminal utilization of information obtained through court-ordered psychological or psychiatric examination, whether for diagnosis, therapy, or other treatment of any nature ordered in conjunction with abuse and neglect proceedings. Accordingly, we conclude that West Virginia Code § 49-6-4 applies to disclosures in any *court-ordered* examination of an accused who is a respondent in an abuse and neglect proceeding, whether such disclosures occur in the course of diagnosis or treatment.[12] If

---

12. *See, e.g., Hutchison v. City of Huntington*, 198 W.Va. 139, 150, 479 S.E.2d 649, 660 (1996) ("The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of the drafters.") (citation and internal quotation marks omitted); syl. pt. 2, *Click v. Click*, 98 W.Va. 419, 127 S.E. 194 (1925) (holding that it is "the duty of a court to disregard a construction,

a trial court, in the course of an abuse and neglect proceeding, requires by its order that an accused submit to an examination by a person proposed by any party as an expert who is neither a *physician, psychologist, or psychiatrist,* such an examination is conducted under warrant of law [13] and is, accordingly, subject to the prohibitions of West Virginia Code § 57–2–3.[14] We further hold that, in an abuse and neglect proceeding, an accused required by court order to undergo an examination by an expert who is neither a physician, psychologist, or psychiatrist is entitled to have the trial court's determinations regarding the protections afforded by West Virginia Code § 57–2–3 set forth in a protective order for future reference. We are mindful of this Court's holding in *State ex rel. Wright v. Stucky,* 205 W.Va. 171, 517 S.E.2d 36 (1999), that neither West Virginia Code § 57–2–3 nor a protective order under Rule 26(c) of the West Virginia rules of Civil Procedure provide use immunity to *require* a person to answer questions in civil discovery over a claim of the privilege against self-incrimination, remarking in the body of the opinion that the subject statute protects only statements made in court. To the extent that *Stucky* conflicts with our holding here regarding the protections afforded by West Virginia Code § 57–2–3, *Stucky* is hereby modified to exclude from its holding court-ordered examinations in abuse and neglect proceedings.[15]

The remedial interpretations adopted by this Court serve a twofold purpose: first, they provide significant protection of the Fifth Amendment rights of the accused; and second, they advance the significant goal of ascertaining truth and appropriate protection of children's rights in abuse and neglect proceedings by removing a potential stumbling block to full and complete disclosure, investigation, and treatment of perpetrators. As this Court has consistently recognized, the primary goal in all abuse and neglect cases must be the health and welfare of the children. *In re Katie S.,* 198 W.Va. 79, 479 S.E.2d 589 (1996). Any operation of the statute which provides less than such constructive, comprehensive protection would be incongruous with the underlying intent of both the statute itself and the goal of abuse and neglect proceedings.

We emphasize here that these protective statutes apply only to court-ordered examinations. Obviously, there is no basis to extend those protections to investigations prior to the filing of an abuse and neglect proceeding, other contacts with DHHR personnel, or statements made in MDT meetings where numerous persons may be present. In those situations, a parent is left to his or her own judgment whether to speak or remain silent on all or any issue that may arise.

### E. Necessity for Remand

■ The Appellant chose to remain silent in the abuse and neglect proceeding based upon what this Court considers a legitimate concern regarding the clarity and scope of the protective statutes. Based upon the Appellant's decision to remain silent, he was unable to utilize his improvement periods for their intended benefit, as "an opportunity to remedy the existing problems." *West Virgi-*

though apparently warranted by the literal sense of the words in a statute, when such construction would lead to injustice and absurdity").

13. *See State v. Legg,* 59 W.Va. 315, 53 S.E. 545 (1906), for discussion of examination under warrant of law.

14. *See* Fisher, *The Psychotherapeutic Professions And The Law Of Privileged Communications,* 10 Wayne Law Review 609 (1964). Fisher proposes that the general psychotherapeutic privilege should apply "where one (or more) is seeking help in the solution of a mental problem caused by psychological and/or environmental pressures from another whose training and status are such as to warrant other persons confiding in him for the purpose of such help." *Id.* at 617.

15. We perceive that examinations by a court-sanctioned expert, whether for diagnosis, therapy or other treatment, are such an integral part of West Virginia's detailed plan for the consideration of abuse and neglect cases and their ultimate impact on family relationships that such examinations, held as they are "under warrant of law" must be treated as "legal examinations," enabling but not requiring an accused parent to fully participate in rehabilitative efforts. Evidence obtained in such examinations may be used in the abuse and neglect proceeding; however, use in a subsequent criminal proceeding, other than for perjury or false swearing, would be excluded under such a protective order.

*nia Dept. of Human Serv. v. Peggy F.,* 184 W.Va. 60, 64, 399 S.E.2d 460, 464 (1990). As this Court explained in syllabus point six of *In re Carlita B.,* 185 W.Va. 613, 408 S.E.2d 365 (1991),

> At the conclusion of the improvement period, the court shall' review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child.

When the Appellant did not attempt to utilize his improvement period for its intended benefit, the lower court concluded that the Appellant had not demonstrated improvement and found that termination was justified.

We conclude that the Appellant did not utilize his improvement periods and chose to remain silent based upon legitimate legal questions of constitutional dimension. These questions addressed the perceived illusory effect of the statutes discussed herein, questions this Court has now answered for the first time. As we have noted, the trial court shared the Appellant's concerns, but until this Court addressed those concerns the Appellant had no remedy, and the trial court was understandably equally constrained.

Our discussion herein should permit the Appellant to pursue his case more aggressively on remand and permit him to seek full evaluation and treatment, if he desires to prevent termination of his parental rights. On remand, the Appellant should be provided with one additional improvement period. If the Appellant chooses to remain silent, whether based upon the Fifth Amendment or otherwise, then the termination order should stand, based upon the reasoning of the lower court. By this opinion, we have clarified the breadth of the legislative provision and have

emphasized that a limiting order could be crafted to identify protected conversations, admissions, evaluations, and treatment to protect the Appellant from the fear that anything expressed in conjunction with the abuse and neglect proceeding will be utilized in the criminal proceeding.[16] Our conclusions herein shall have only prospective application in other cases wherein an order of termination has not been entered.

On remand, the lower court should assess the Appellant's progress at the cessation of this additional improvement period and proceed accordingly, within the discretion of the lower court. The lower court correctly determined that the abuse and neglect could not be remedied without the cooperation and treatment of the Appellant. However, our review of the record compels our conclusion that the Appellant withheld such cooperation and submission to treatment based upon a legitimate concern. That concern having been resolved herein, to the extent possible, the Appellant should be entitled to demonstrate whether he possesses the desire and ability to fully cooperate in a meaningful improvement period.

In so ruling, this Court does not wish to express any preference or opinion regarding the ultimate determination of the lower court on the issue of termination of the Appellant's parental rights or the degree to which the Appellant may be permitted supervised visitation or post-termination visitation.

We are also cognizant of the need for final resolution in the lives of these young children. Were these children being placed for adoption or lingering in foster care, we would be less disposed toward extending the additional improvement period to the Appellant. Where the children are securely with their mother, however, we see no impediment to permitting the Appellant the opportunity to participate in a meaningful improvement period, if he so chooses.

---

16. We also emphasize that a prosecutor handling both the abuse and neglect case and the criminal charges against the same individual must be discreet and judicious in the use of information inculpating the individual, to assure that information gleaned in the abuse and neglect context is not improperly utilized in the criminal prose- cution. In *State v. James R., II,* 188 W.Va. 44, 422 S.E.2d 521 (1992), this Court explained that a prosecutor did not represent conflicting interests by representing the state in a civil abuse and neglect proceeding and subsequently in criminal proceedings against same person. *Id.* at 46, 422 S.E.2d at 523.

If termination is the ultimate result, the possibility of post-termination visitation must also be addressed by the lower court. We directed as follows in syllabus point five of *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995):

> When parental rights are terminated due to neglect or abuse, the circuit court may nevertheless in appropriate cases consider whether continued visitation or other contact with the abusing parent is in the best interest of the child. Among other things, the circuit court should consider whether a close emotional bond has been established between parent and child and the child's wishes, if he or she is of appropriate maturity to make such request. The evidence must indicate that such visitation or continued contact would not be detrimental to the child's well being and would be in the child's best interest.

Reversed and Remanded with Directions.

DAVIS, Chief Justice, dissenting.

(Filed March 15, 2002)

Daniel D., father of the unfortunate children involved in this case, contends that he was denied due process when the circuit court terminated his parental rights. Daniel D. has argued that he did not have adequate protection against self-incrimination in order to fully participate in the improvement periods extended to him by the circuit court. The majority opinion agreed with Daniel D. and reversed the circuit court's termination orders. Because the majority opinion has not properly applied existing precedent, and, in reaching its ultimate resolution of this case, has utterly and inexcusably failed to consider the best interests of the two inno-

cent children involved, I am compelled to dissent.

### Our Prior Holding in *State v. James R.* Should Have Controlled this Case

The record clearly shows that the evidence established without a doubt that Daniel D. repeatedly sexually abused his four year old daughter.[1] However, the majority opinion has determined that Daniel D. needs yet another opportunity to demonstrate that he has changed and will never again sexually assault his children. This determination is wrong.

The circuit court initially awarded Daniel D. a three month improvement period. During this improvement period, Daniel D. absolutely refused to participate in any activity that would assist in proving he was on the road to recovery. Nevertheless, the circuit court was patient with Daniel D. In fact, the circuit court gave Daniel D. a second three month improvement period. However, Daniel D. once again refused to cooperate in rehabilitation efforts. Faced with unrefutable evidence that Daniel D. had engaged in sexual activities with his adolescent daughter, and further faced with the fact that Daniel D. refused to cooperate with efforts toward rehabilitation, the circuit court fulfilled its obligation under the law to protect the innocent children by terminating Daniel D.'s parental rights. The majority opinion, by reversing the termination orders, has rewarded Daniel D. for refusing efforts of rehabilitation, and has failed to protect the interests of the D. children.[2]

The majority opinion attempts to justify its decision by erroneously asserting that our law is unclear as to whether Daniel D. would have incriminated himself by participating in an improvement period. To this end, the

1. The majority opinion did not disturb the circuit court's determination that Daniel D. engaged in sexual activity with his daughter. In other words, even the majority opinion has agreed that Daniel D. sexually abused his daughter.

2. Even when addressing parents' rights in child abuse and neglect cases, the best interests of the child(ren) must be given priority. *See In re Emily*, 208 W.Va. 325, 336, 540 S.E.2d 542, 553 (2000) ("A parent's rights are necessarily limited in this respect because the pre-eminent concern in abuse and neglect proceedings is the best

interest of the child subject thereto."); Syl. pt. 3, *In re Michael Ray T.*, 206 W.Va. 434, 525 S.E.2d 315 (1999) (" 'Cases involving children must be decided not just in the context of competing sets of adults' rights, but also with a regard for the rights of the child(ren).' Syllabus point 7, *In re Brian D.*, 194 W.Va. 623, 461 S.E.2d 129 (1995)."); *Michael K.T. v. Tina L.T.*, 182 W.Va. 399, 405, 387 S.E.2d 866, 872 (1989) ("[T]he best interests of the child is the polar star by which decisions must be made which affect children." (citation omitted)).

majority opinion crafted the illusion that a new and novel issue was raised in this case. That is, the majority opinion asserted that our law is unclear as to whether a parent in a child abuse and neglect proceeding could meaningfully participate in an improvement period without having such participation used against the parent in a subsequent criminal prosecution. This issue is neither new nor novel. In fact, the exact issue was squarely addressed by the Court in *State v. James R., II*, 188 W.Va. 44, 422 S.E.2d 521 (1992).

*James R.* involved a father who was charged, in a civil child abuse and neglect proceeding, with sexually abusing his three children and forcing his wife to engage in sex with their oldest son. The circuit court found that sexual abuse had occurred, but granted the father an improvement period. After the improvement period, criminal charges were brought against the father based upon his sexual abuse of the children. The father motioned the circuit court to disqualify the prosecutor from the criminal proceeding because the prosecutor had taken part in the civil child abuse and neglect proceeding. The circuit court granted the motion. The State appealed the order of disqualification.

This Court held in *James R.* that the circuit court erroneously disqualified the prosecutor. We explained "a prosecutor does not represent conflicting interests by representing the State first in a civil abuse and neglect proceeding and then in subsequent criminal proceedings against the same person." *James R.*, 188 W.Va. at 47, 422 S.E.2d at 524. The reasoning in *James R.* was based upon the fact that the prosecutor could not use evidence against the father that had been obtained during the course of the father's cooperation with the requirements of the improvement period. *James R.* made this point abundantly clear in syllabus point 3 of the opinion:

> No evidence that is acquired from a parent or any other person having custody of a child, as a result of medical or mental examinations performed in the course of civil abuse and neglect proceedings, may be used in any subsequent criminal proceedings against such person. W.Va.Code § 49–6–4(a) (1992).

*James R.* controlled the disposition of this case. The father in the instant matter alleged that he did not cooperate with the mental health evaluators during the improvement period, because he believed that his cooperation would have been used against him in a criminal proceeding. The contention was baseless. *James R.* made clear that the father in the instant case could cooperate with authorities during the improvement period, and none of that evidence could be used in any subsequent criminal proceedings. The majority opinion has engaged in a long-winded dissertation to come to the exact same conclusion that was reached in *James R.*[3] The majority opinion considered its holding unprecedented, which enabled it to conclude that Daniel D. was unaware he could participate in the improvement period without the threat of incriminating himself. In light of the existing precedent of *James R.*, the majority opinion's conclusion in this regard is clearly flawed.[4]

---

3. For example, compare syllabus point 7 of the majority opinion with syllabus point 3 of *James R.*, which is quoted above. Syllabus point 7 of the majority opinion states:

> West Virginia Code § 49–6–4 (1984) (Repl. Vol.2000) was intended to constitute a full and comprehensive prohibition against criminal utilization of information obtained through court-ordered psychological examination, whether for diagnosis, therapy, or other treatment of any nature ordered in conjunction with abuse and neglect proceedings.

This construction of W.Va.Code § 49–6–4 constitutes no new law and is nothing more than an unnecessary restatement of syllabus point 3 of *James R.*

4. The majority opinion was also disingenuous with its creation of syllabus points 8 and 9. Those syllabus points were intended to hold that when a parent consults with non-medical professionals during an improvement period, the parent's cooperation cannot be used against him or her. Such a holding has no basis in this case. Daniel D. *refused* to cooperate with the mental health evaluators. The trial court's decision in this case was not based upon the failure to cooperate with anyone else. Thus, the majority opinion should never have addressed a matter that had no application to the facts presented. Similarly, because the Court was not asked in this case to address the question of post-termination visitation, the topic should not have been raised. I am appalled that the majority opinion, nevertheless, seems to suggest that such visitation may be appropriate where a father has sexually abused

In the final analysis, this case presented a simple issue that this Court previously resolved in *James R.* The majority opinion elected to ignore *James R.* by holding that our law was unclear as to the consequences of cooperating with professional authorities during an improvement period. As a result of the majority decision, the lives and mental stability of two innocent children must continue to be held in limbo. Such an outcome is certainly not in these children's best interest. *See* Syl. pt. 1, in part, *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991) ("Child abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security...."). Meanwhile, Daniel D. gets to decide for the third time whether or not he is prepared to take responsibility for conduct he was unequivocally found to have committed during the abuse and neglect proceedings. In deciding to allow Daniel D. a third improvement period,

the majority opinion has clearly failed in its duty to consider the best interests of the children whose well being is at stake. " 'The goal of an improvement period is to facilitate the reunification of families *whenever that reunification is in the best interests of the children involved.*' " *In re Emily,* 208 W.Va. 325, 334, 540 S.E.2d 542, 551 (2000) (emphasis added) (quoting *State ex rel. Amy M. v. Kaufman,* 196 W.Va. 251, 258, 470 S.E.2d 205, 212 (1996)).

For the reasons stated, I dissent from the majority decision. I am authorized to state that Justice MAYNARD joins me in this dissenting opinion.

his child and then unequivocally refused any treatment.