**STATE OF WEST VIRGINIA
SUPREME COURT OF APPEALS**

*In re* **V.E. and U.E.**

**No. 21-0303** (Lewis County 20-JA-25 and 20-JA-26)

**MEMORANDUM DECISION**

Petitioner Father E.E., by counsel Betty Clark Gregory, appeals the Circuit Court of Lewis County's March 23, 2021, order terminating his parental rights to V.E. and U.E. and denying him post-termination visitation with the children.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Mindy M. Parsley, filed a response in support of the circuit court's order. The guardian ad litem, Hunter D. Simmons, filed a response on behalf of the children in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in denying him post-termination visitation with the children and failing to provide him proper discovery.[2]

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In June of 2020, the DHHR filed a child abuse and neglect petition against petitioner and the mother alleging that the children were sexually abused by family members and friends in the parents' home. It further alleged that the home was unsanitary, lacked running water, did not have a working toilet, and was filled with animal feces and urine. Specifically, the DHHR alleged that the mother allowed her brother, nineteen-year-old J.K., to stay in the home, where he sexually

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

[2]Petitioner does not challenge the termination of his parental rights to the children on appeal.

1

abused the children. The DHHR asserted that J.K. had shown his penis to at least one of the children in the home, twelve-year-old R.B., who is not at issue on appeal.[3] The DHHR alleged that J.K. took pictures of R.B.'s breasts, became intoxicated, and had sex with the child.

According to the petition, a Child Protective Services ("CPS") worker and a West Virginia State Police trooper visited petitioner's home in June of 2020 and interviewed J.K. about the sexual abuse allegations. The DHHR alleged that the CPS worker and trooper also spoke to the children inside the home, although sixteen-year-old V.E. was not in the home at the time and the mother refused to provide V.E.'s location to the CPS worker. The DHHR alleged that the trooper later interviewed J.K. at the Lewis County State Police detachment, where J.K. admitted to engaging in sexual intercourse with twelve-year-old R.B. A CPS worker interviewed R.B., who confirmed that J.K. engaged in sexual intercourse with her in petitioner's home. The child also disclosed that another man, C.F., a registered sex offender, had stayed in petitioner's home and had sex with her on numerous occasions there. Upon further inquiry, R.B. disclosed that petitioner and the mother were sleeping in their bed, less than three feet away, when the incidents of abuse took place.

After the disclosures of abuse, the DHHR enacted a temporary protection plan. The DHHR alleged that as R.B. was gathering her belongings to leave the residence, the CPS worker observed the mother instructing the child to "keep [her] f*cking mouth shut." Later that month, the CPS worker interviewed V.E. at her grandmother's residence. V.E. disclosed that she did not stay at petitioner's home often because there were so many visitors to the residence and the home lacked running water.

Finally, the CPS worker interviewed petitioner, who advised that he witnessed R.B. and C.F., a registered sex offender, always laying on top of each other. Petitioner claimed that he confronted the mother and told her that C.F. needed to move out of their home. Petitioner alleged that the mother defended C.F. and asked petitioner to leave the home, instead of C.F. Petitioner told the CPS worker that he moved to Indiana for three months beginning in February of 2020. The DHHR further alleged that J.K. was charged with sexual abuse by a parent or guardian in June of 2020.

In June of 2020, the circuit court held a preliminary hearing wherein it found that the parents allowed a registered sex offender, C.F., to reside at their home and have access to R.B. The court found that the parents also failed to protect R.B. from C.F. and J.K. and allowed C.F. and J.K. to sexually abuse the child.

The DHHR filed an amended petition in September of 2020 alleging that the parents allowed another registered sex offender, D.P., into their home with access to V.E. The DHHR further alleged that the parents allowed D.P. to sexually abuse the child.

---

[3]According to the petition, the mother filed a petition in 2017 to gain temporary guardianship of R.B., which was denied. Nevertheless, R.B. resided with the mother and petitioner—without any legal relationship or custody—for several years. The DHHR also alleged that R.B. referred to petitioner and the mother as "mom and dad." During the instant proceedings, the circuit court terminated R.B.'s parents' parental rights, as well.

Thereafter, the circuit court convened multiple adjudicatory hearings over several months. At one hearing, the DHHR entered C.F.'s criminal conviction order and sex offender registry documents into evidence. The DHHR also entered forensic interviews with children R.B., V.E., and U.E. into evidence. At another hearing, S.L., the daughter of J.K.'s ex-girlfriend, testified that J.K. lived at petitioner's home. S.L. testified that she witnessed J.K. speak to twelve-year-old R.B. as if they were dating. S.L. further testified that she once looked at J.K.'s phone and found explicit pictures of R.B. After she found the photographs, S.L. testified that she contacted CPS and sent CPS the photographs. S.L. stated that she also told the mother about the pictures of J.K. and R.B., but that the mother responded that J.K. "would not do something like that."

At another adjudicatory hearing, D.M.—petitioner's stepdaughter and a biological daughter of the mother—testified that the parents' home was "hoarded" and "full of boxes and items stacked from floor to ceiling." D.M. also testified that the home had lacked running water for several years. According to D.M., this was in spite of the fact that several family members offered to help fix the waterlines at the home. D.M. stated living conditions in the home strained her relationship with the parents, as she believed her younger sisters deserved better. D.M. also stated that petitioner received social security disability benefits and the mother received compensation from ResCare to care for U.E., a fifteen-year-old special needs child. D.M. testified that V.E. explained to her that C.F. was a registered sex offender while he lived in the home. D.M. stated that she informed the parents about C.F.'s status and explained that it was inappropriate for him to be around or live with the children. D.M. further testified that the mother argued with her and stated that C.F. was "wrongfully convicted." However, D.M. also testified that the mother admitted to her that she was aware that J.K. was having sexual intercourse with R.B. The mother also admitted to D.M. that she had seen pornographic images of J.K. and the child. Finally, D.M. testified that V.E. admitted to the parents that she was having sexual intercourse with J.K.

Next, petitioner testified that he was the biological father of V.E. and U.E. and stated that he had no biological relationship with R.B. Petitioner testified that he did not want J.K. living at their home and spent time living on his own outside of the home due to J.K.'s presence. However, petitioner acknowledged that he made no effort to remove the children from the home and admitted he could have done so. Petitioner also acknowledged that adults resided in his home and had sex with V.E. when she was as young as fifteen years old. Petitioner further admitted that he witnessed C.F. and R.B. laying on a bed together despite knowing C.F. was a registered sex offender. Petitioner stated that he took no action to stop it, other than notifying the mother. After considering the evidence and testimony, the circuit court adjudicated the parents as abusing and neglecting.

The circuit court held a dispositional hearing in March of 2021 wherein the DHHR moved to admit the parents' psychological evaluations. The DHHR presented evidence that although petitioner had previously admitted to knowing about the sexual abuse of the children in his home, he denied knowledge of any sexual abuse during his psychological evaluation conducted after adjudication. After considering the evidence, the circuit court found that petitioner exposed the children to numerous sex offenders and allowed the abusers to have unfettered access to the children. The circuit court further found that petitioner made no effort to protect any of the children from the sex offenders. The court found that petitioner's psychological evaluation noted that petitioner lacked the parental capacity to care, protect, or change in order to provide for the children. The circuit court noted that V.E. and U.E. did request visitation with petitioner. However,

the court found that children's request for visitation was "relative in nature to their feelings and requests toward [the mother]," and that permitting visitation between petitioner and the children "will only serve to keep the memories of years of sexual abuse and neglect alive." Accordingly, the court terminated petitioner's parental rights to the children and denied post-termination visitation. Petitioner now appeals from the circuit court's March 23, 2021, dispositional order.[4]

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner's first assignment of error concerns the circuit court's denial of his request for post-termination visitation. According to petitioner, the circuit court did not properly consider the children's wishes by denying visitation with him. Petitioner argues that he had close emotional bonds with the children, both children requested visitation with him, and it would be in the children's best interests to have visits with him. As such, petitioner asserts that post-termination visitation would be appropriate. We disagree.

In addressing post-termination visitation, the Court has directed as follows:

> "When parental rights are terminated due to neglect or abuse, the circuit court may nevertheless in appropriate cases consider whether continued visitation or other contact with the abusing parent is in the best interest of the child. Among other things, the circuit court should consider whether a close emotional bond has been established between parent and child and the child's wishes, if he or she is of appropriate maturity to make such request. The evidence must indicate that such visitation or continued contact would not be detrimental to the child's well being and would be in the child's best interest." Syl. Pt. 5, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995).

---

[4]The mother's parental rights were also terminated below. The permanency plan for V.E. is to complete an independent living program before reaching the age of majority. U.E. has achieved permanency through a legal guardianship with her adult sister, D.M.

Syl. Pt. 11, *In re Daniel D.*, 211 W. Va. 79, 562 S.E.2d 147 (2002). While petitioner is correct that the children requested visitation with him, the circuit court specifically found that continued visitation would not be in the children's best interests, which is, ultimately, the controlling determination on this issue. *See Kristopher O. v. Mazzone*, 227 W. Va. 184, 192, 706 S.E.2d 381, 389 (2011) ("[T]he best interests of the child is the polar star by which decisions must be made which affect children."). Indeed, the disturbing facts surrounding the many findings of sexual abuse inside petitioner's home, including his knowledge of some of these incidents, support the circuit court's denial of post-termination with the children. As the circuit court found below, petitioner "repeatedly and intentionally [] exposed the infant [children] to numerous sex offenders and gave the sex offenders unfettered access to the children." This finding was based on the fact that petitioner testified that he "had concerns and wanted certain sex offenders to get out of the house." However, the court found that petitioner "made absolutely no effort to protect any of the [children] from any of the sex offenders." Given that petitioner, the children, and other witnesses testified about multiple episodes of sexual abuse occurring while the children were in petitioner's care, the circuit court's findings in this regard are well supported.

Although petitioner contends that the children requested post-termination visitation with petitioner, we find that there is nothing in the record to indicate that the court did not properly consider this request. According to West Virginia Code § 49-4-604(c)(6)(C), "the court shall give consideration to the wishes of a child [fourteen] years of age or older or otherwise of an age of discretion as determined by the court regarding the permanent termination of parental rights." Both V.E. and U.E. were sixteen and seventeen years old, respectively, at the time of the dispositional hearing. This statute does not, however, bind a circuit court to follow such wishes, especially in circumstances such as those presented below where a parent has demonstrated a total inability to protect the children. Based on the circuit court's extensive findings regarding petitioner's inability to protect the children from repeated acts of sexual abuse, we find no error in the circuit court's denial of his motion for post-termination visitation.

Finally, petitioner asserts that the circuit court erred in failing to require the DHHR to provide him adequate discovery, which prohibited him from making arguments using that information. He argues, without any support from the record, that the DHHR failed to provide him with family functioning assessments, the mother's psychological evaluation, and other reports it possessed. He concludes that he was denied an opportunity to present this evidence to the court.

Petitioner's brief on appeal is inadequate, both in terms of complying with this Court's rules and in terms of attempting to establish this alleged error by the circuit court. Specifically, petitioner fails to cite to the points of fact relied upon that would entitle him to relief, which is in violation of Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure.[5] As this Court has

---

[5]Rule 10(c)(7) provides as follows:

The brief must contain an argument exhibiting clearly the points of fact and law presented, the standard of review applicable, and citing the authorities relied on,

(continued . . . )

5

held, "[a] skeletal 'argument,' really nothing more than an assertion, does not preserve a claim . . . . Judges are not like pigs, hunting for truffles buried in briefs." *State v. Kaufman*, 227 W. Va. 537, 555 n.39, 711 S.E.2d 607, 625 n.39 (2011) (citation omitted).

Even in hunting for support of petitioner's argument, none can be found in the record. Indeed, the appendix includes both family functioning assessments and the mother's psychological evaluation report. It is unclear from petitioner's argument why he purportedly did not have access to documents that were made part of the record by the circuit court. As we have previously held,

> [a]n appellant must carry the burden of showing error in the judgment of which he complains. This Court will not reverse the judgment of a trial court unless error affirmatively appears from the record. Error will not be presumed, all presumptions being in favor of the correctness of the judgment.

Syl. Pt. 4, *State v. Myers*, 229 W. Va. 238, 728 S.E.2d 122 (2012) (citations omitted). As petitioner has failed to point to or cite to any portion of the record demonstrating that the family functioning assessments or the mother's psychological evaluation were not made part of the record below, we find no error in the proceedings in this regard.

For the foregoing reasons, we find no error in the decision of the circuit court, and its March 23, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: October 13, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton

---

under headings that correspond with the assignments of error. The argument must contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal. The Court may disregard errors that are not adequately supported by specific references to the record on appeal.